WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Kendrick, | ) No. CV 11-296-TUC-HCE |
|         Plaintiff, | ) **ORDER** |
| | ) |
| vs. | ) |
| | ) |
| Michael J. Astrue, Commissioner of the | ) |
| Social Security Administration, | ) |
|         Defendant. | ) |
| | ) |

      Plaintiff has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent.  *See* 28 U.S.C. § 636(c).

      Pending before the Court are Plaintiff's Opening Brief (Doc. 18) (hereinafter "Plaintiff's Brief"), and Defendant's Opposition to Plaintiff's Opening Brief (Doc. 19) (hereinafter "Defendant's Brief").  For the following reasons, the Court will remand this matter for further administrative proceedings.

I.     PROCEDURAL HISTORY

      On April 14, 2006, Plaintiff protectively filed with the Social Security Administration (hereinafter "SSA") an application for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act,  alleging an amended disability onset date of April 1, 2004.  (TR. 262-270, 384). Plaintiff, who is right handed, alleges that she is unable to work due to a torn right rotator cuff, broken right clavicle, degenerative disc disease, and right knee pain. (TR. 37, 329).  Plaintiff's application was denied initially and

1  on reconsideration, after which Plaintiff requested a hearing before an administrative law

2  judge. (TR. 118-121, 123-126).  The matter came on for hearing in December 2007 before

3  Administrative Law Judge (hereinafter "ALJ") Norman R. Buls. (TR. 33-59).  On January

4  23, 2009, the ALJ issued his decision denying Plaintiff's claim. (TR. 110-117). Plaintiff

5  appealed, and on April 17, 2009, the Appeals Council vacated the ALJ's decision and

6  remanded the matter to the ALJ for further proceedings. (TR. 228-231).  A hearing on

7  remand was held on December 8, 2009, wherein Plaintiff and vocational expert Kathleen

8  McGavin[1] testified. (TR. 60-101). On January 26, 2010, the ALJ again denied Plaintiff's

9  claim. (TR. 18-27).  Plaintiff appealed and, on March 18, 2011, the Appeals Council denied

10  Plaintiff's request for review thereby rendering the ALJ's January 26, 2010 decision the final

11  decision of the Commission. (TR. 1-5). Plaintiff then initiated the instant action.

12  II.    INTRODUCTION

13      Plaintiff was born on June 7, 1958, and was 45 years of age at the time of her alleged

14  disability onset date of April 1, 2004.  (TR. 36, 262; Plaintiff's Brief, p.2).  She is widowed

15  and has one minor daughter in addition to grown children.  (TR. 36-37).

16      Plaintiff graduated high school and attended two years of college where she majored

17  in criminology. (TR. 72).  Between 2004 and 2006, Plaintiff worked successively in several

18  positions, including: caregiver "sitting with an elderly woman"; table server;  manager with

19  a fast food pizza restaurant for 30 hours a week; employee of Subway sandwich shop; and

20  phone solicitor.  (TR. 69-70, 73-75).  Plaintiff's employment in these various positions

21  generally lasted from six weeks to a six months.  (*Id.*).  Plaintiff asserts  that she is unable to

22  work due to pain in her knees, left hip, right elbow, right shoulder, neck, back, feet and

23  hands, in addition to mental impairments that leave her "in a panicked state."  (TR. 76).

24  Plaintiff testified that her knees hurt constantly, the right more than the left, and she has

25

26      [1]The transcript of the hearing reflects that the VE was named Kathleen McGavin (TR.

27  61, 92).  The record also contains a resume for VE Kathleen McAlpine.  (TR. 258-259).
   Plaintiff states that the VE who testified was named Kathleen McAlpine.  (Plaintiff's Brief,

28  p.4 (*citing* TR. 92-101, 258-260)).

constant discomfort in her hip.  (TR. 80, 83).  Plaintiff's treating orthopedist recommended a total hip replacement in September 2009, and surgery has also been recommended for her back, but she is "too afraid to get it."  (TR. 81-82, 91).  Plaintiff also testified that she received a referral for replacement of both of her knees.  (TR. 80).  Arthritis in her hands causes stiffness and aching as well as difficulty fastening buttons and the like.  (TR. 83-84).  In 2003, Plaintiff suffered a torn rotator cuff and a stress fracture in her clavicle and she still has pain in her right shoulder.  (TR. 91).  In 2004, she was involved in a car accident and suffered a broken elbow.  (*Id.*). Dampness exacerbates her pain.  (TR. 85).   Her doctor prescribed a cane, which she uses most of the time, because of imbalance due to pain in her feet.  (TR. 79 ("Dr. Hecklesell [phonetic]" prescribed the cane.)). She wears a brace on her right knee.  (TR. 81).   Sitting for more than 30 minutes causes pain and cramping in Plaintiff's back, and on a bad day, she can sit for no longer than ten minutes.  (TR. 88-89). She cannot lift more than a half-gallon container of milk.  (TR. 77).   Plaintiff testified that she can stand about 15 minutes, after which her feet will go numb and knees begin to hurt. (TR. 90).  Plaintiff also frequently feels tired, which she believes is a side effect of her medications.  (TR. 78-79).  She testified that her medications also make her unable to think clearly.  (TR. 79).

Additionally, Plaintiff suffers from depression, which causes her not to "care about anything" and feel useless, embarrassed, and scared.  (TR. 86). "It's just depressing, when you try to do small things that you take for granted and you realize you can't even do them anymore.  You can't open a jar,...pick up a gallon of milk,...have a sensible conversation...go for a walk with your daughter."  (*Id.*).  She also has anxiety and has experiences panic attacks a couple times a month.  (TR. 86-87).

Plaintiff lives with her daughter.  (TR. 72).  She owns a car and has a driver's license. (TR. 73).  In a typical day, Plaintiff arises at 4:30 a.m., takes her medication, after which her son or sister-in-law will take her daughter to school.  (TR. 77).  Plaintiff will then sit in a recliner to watch the news and she "sleep[s] a lot" during the day.  (TR. 78).  A friend will stop by to clean or prepare her something to eat.  (*Id.*).  Plaintiff's children will usually do

the grocery shopping for her.  (*Id.*).  Plaintiff requires help with household chores and she rarely cooks.  (*Id.*).

III.     THE ALJ'S FINDINGS

1.     Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id*.  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id*.  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity (hereinafter "RFC")[2] to perform past work.    20 C.F.R. §§

_____

[2]RFC is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945.

404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.  *Id*.  However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 C.F.R. §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines (hereinafter "grids") promulgated by the SSA. *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, the grids do not apply where the claimant has significant nonexertional limitations. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). When the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

### 2.    The ALJ's Decision

In his January 26, 2010 decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.    The claimant has engaged in substantial gainful activity since April 1, 2004, the amended onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease, cervical and lumbar spine; fracture and tendonitis of the right clavicle; degenerative joint disease of the right elbow and right knee; and chronic pain syndrome (20 CFR 404.1520(c)).

     ***

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

     ***

5.       After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except she may frequently reach, handle, finger, feel, push or pull with the left and may frequently handle, finger, feel, push or pull with the right hand; but may occasionally reach both overhead and other directions. Claimant may frequently operate foot controls with both feet, may occasionally climb stairs and ladders, balance, stoop, crouch, but may never kneel or crawl. Claimant is limited to occasionally working at unprotected heights, and with moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme heat or cold, vibrations, and may frequently tolerate loud noise such as heavy traffic. Claimant can perform activities like shopping, traveling without a companion, ambulate without use of wheelchair or walker, two canes or two crutches, walk a block at a reasonable pace on a rough or uneven surface, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care for personal hygiene, sort, handle and use paper files.
***

6.       The claimant is capable of performing past relevant work as a companion or telephone solicitation. Either work does not require the performance of work-related activities precluded by claimant's residual functional capacity (20 CFR 404.1565).
***

7.       The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2006 through the date of this decision (20 CFR 404.1520(f)).

<u>DECISION</u>

Based on the application for a period of disability and disability insurance benefits filed on April 4, 2006, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

(TR. 18-27).  In his decision, the ALJ pointed out that the position of companion is considered light and semi-skilled and the position of telephone solicitor is considered sedentary and semi-skilled. (TR. 27).  He also cited the VE's testimony that Plaintiff could perform either work with the ability to sit and stand at her option.  (*Id.*).

IV.   DISCUSSION

A.   Argument

Plaintiff asserts that the ALJ improperly rejected treating Dr. Gecosala's opinion that Plaintiff was completely disabled and unable to work.  (Plaintiff's Brief, pp. 15-17).

1  Plaintiff also argues that the ALJ improperly rejected the assessments of treating Dr. Skinner,
2  as well.  (*Id.* at pp. 17-18).
3         Defendant contends that the ALJ reasonably considered and weighed the opinions
4  from Doctors Gecosala and Skinner.  According to Defendant, the ALJ's RFC assessment
5  is supported by substantial evidence in the record.
6         B.     Standard of Review
7         An individual is entitled to disability insurance benefits if he or she meets certain
8  eligibility requirements and demonstrates the inability to engage in any substantial gainful
9  activity by reason of any medically determinable physical or mental impairment which can
10 be expected to result in death or which has lasted or can be expected to last for a continuous
11 period of not less than twelve months.  42 U.S.C. §§ 423, 1382.  "'A claimant will be found
12 disabled only if the impairment is so severe that, considering age, education, and work
13 experience, that person cannot engage in any other kind of substantial gainful work which
14 exists in the national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d
15 172, 174 (9th Cir. 1990)).
16        To establish a *prima facie* case of disability, the claimant must demonstrate an
17 inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir.
18 1984).  Once the claimant meets that burden, the Commissioner must come forward with
19 substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d
20 1427, 1429 (9th Cir. 1985).
21        The findings of the Commissioner are conclusive and courts may overturn the
22 decision to deny benefits "only if it is not supported by substantial evidence or it is based on
23 legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted).
24 Therefore, the Commissioner's determination that a claimant is not disabled must be upheld
25 if the Commissioner applied the proper legal standards and if the record as a whole contains
26 substantial evidence to support the decision.  *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir.
27 1990) (*citing Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th
28 Cir. 1983)).  Substantial evidence is defined as such relevant evidence which a reasonable

1    mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064,

2    1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However,

3    substantial evidence is less than a preponderance.  *Matney,* 981 F.2d at 1019.

4         The Commissioner, not the court, is charged with the duty to weigh the evidence,

5    resolve material conflicts in the evidence and determine the case accordingly.  *Id.*  However,

6    when applying the substantial evidence standard, the court should not mechanically accept

7    the Commissioner's findings but should review the record critically and thoroughly.  *Day v.*

8    *Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence

9    that supports as well as detracts from the examiner's conclusion.  *Id.* at 1156.

10        C.     Analysis

11             1.     Whether the ALJ improperly rejected the opinion of treating Dr.

12             Gecosala

13        Treating Dr. Gecosala opined that Plaintiff was unable to work. (TR. 152, 423).  The

14   ALJ rejected treating Dr. Gecosala's opinion in favor of consulting, examining Dr.

15   Petronella. (TR. 25).

16             a.     Treating Dr. Gecosala

17        Plaintiff first saw Rinly Gecosala, M.D., a specialist in family and occupational

18   medicine, in March 2007  (TR. 477).  In 2003, prior to beginning treatment with Dr.

19   Gecosala,  Plaintiff presented to Tucson Occupational Medicine soon after suffering an on-

20   the-job injury to her right shoulder, after throwing a trash bag into a high dumpster.  (TR.

21   568-69).  She was ultimately diagnosed with right shoulder and trapezius strain, for which

22   she was prescribed ibuprofen and physical therapy.  (*Id.*).  She was also restricted to

23   "[m]odified duty with no lifting/pushing/pulling over 5 lb. with the right upper extremity and

24   no reaching above the shoulder with the right upper extremity."  (TR. 568).  Upon

25   completion of physical therapy, Plaintiff had only minimal improvement.  (TR. 562).  A

26   December 30, 2003 treatment note by Philip Glennie, M.D., indicated that "[a] recent MRI

27   did show significant tendinosis of the supraspinatus tendon...[and] what may well be a

28   hairline fracture of the distal clavicle."  (TR. 559; *see also* TR. 435 (December 16, 2003 MRI

1    of right shoulder reflected supraspinatus tendonosis and "[p]robable hairline fracture of the

2    clavicle")).  Bextra was substituted for ibuprofen and Plaintiff was prescribed six additional

3    weeks of physical therapy.  (TR. 559-560).  By January 2004, Plaintiff's shoulder had

4    become less symptomatic and she was sleeping better.  (TR. 555).  Dr. Glennie opined that

5    Plaintiff was "continu[ing] to slowly heal, but has probably stabilized at a point where she

6    still has a lot of nighttime aching and is very careful with any lifting."  (TR. 553).  Plaintiff

7    was released to "normal duty using the shoulder very carefully."  (*Id.*).

8            February 17, 2004 emergency room records show Plaintiff presented for treatment

9    upon having been involved in a car accident.  (TR. 441-442).  Diagnoses was: acute closed

10   head injury; acute cervical muscle strain; acute lumbosacral strain; and contusion of the

11   elbow. (*Id.*).  On February 27, 2004, Plaintiff presented to Arthur Schachter, M.D., with

12   complaints of pain in her back, neck, leg and right elbow.  (TR. 574).  On examination Dr.

13   Schachter found tenderness in Plaintiff's right arm, tenderness and effusion in the right

14   patella, and tenderness in the right paraspinal of the back.  (TR. 575).  He diagnosed: status

15   post concussive injury; right elbow and right knee contusion; and severe lower back pain.

16   (*Id.*).  He also ordered an MRI of the right shoulder which revealed subcutaneous edema over

17   the elbow with possible tendonosis or tear of the common extensor tendon, and minimal joint

18   effusion.  (*Id.*; TR. 434 (March 5, 2004 MRI)).

19           April 2007 x-rays of Plaintiff's right elbow indicated very mild degenerative changes

20   of the proximal ulna.  (TR. 436).  April 2007 x-rays of Plaintiff's left shoulder showed

21   minimal degenerative changes of the acromioclavicular joint.  (TR. 437).  April 2007 x-rays

22   of Plaintiff's right knee showed minimal joint space narrowing and minimal degenerative

23   changes, with possible mild lateral subluxation of the tibia relative to the femur.  (TR. 438).

24           In March 2007, Plaintiff began treatment with Dr. Gecosala.  (TR. 477).  Thereafter,

25   Dr. Gecosala referred Plaintiff to Ty Endean, D.O., for evaluation of Plaintiff's right shoulder

26   pain and bilateral knee pain.  (TR. 480).  On March 29, 2007, Plaintiff told Dr. Endean that

27   a knee brace had been prescribed, but it had been stolen.  (TR. 480).  Positive findings on Dr.

28   Endean's examination consisted of obesity at a height of 4'10" and a weight of 155 pounds;

positive impingement tests[3]; bilateral patellar tenderness; mild to marked crepitus in the patellofemoral joint bilaterally; medial joint line tenderness on the right; and patellar apprehension bilaterally. (TR. 480-481). Dr. Endean diagnosed: impingement syndrome of the right shoulder; chondromalacia of both knees; and internal derangement of the right knee with a suspected medial meniscal tear. (TR. 481). He recommended a right knee MRI and prescribed Voltaren. (*Id.*).

An April 5, 2007 treatment note by Dr. Gecosala reflects that Plaintiff had previously complained of multiple joint pain and that she suffered from lateral epicondylitis. (TR. 477). At the April 5, 2007 appointment, Plaintiff complained that her elbow pain had worsened and that she had been vomiting. (*Id.*). Examination revealed that Plaintiff was very anxious and that she had crepititations on the knee, pain along the joint lines, ballottment and edema. (*Id.*). Dr. Gecosala found limited range of motion for hyperflexion and hyperextension of the back with sciatica; positive shoulder impingement test with limited shoulder rotation; and that Plaintiff was dehydrated. (*Id.*). Dr. Gecosala refilled Plaintiff's prescription for Oxycodone, refused her request for Oxycodone extended release, and recommended that she take other prescribed medications for arthritis while reducing her use of Oxycodone. (*Id.*).

At an April 26, 2007 follow-up appointment, Dr. Gecosala's examination of Plaintiff revealed limited range of motion in the back, hip, knee and neck; sciatica; positive for provocation test at the lateral epicondyle; and weakness in her lower extremities, in addition to anxiety and breathing issues. (TR. 473). He also noted that Plaintiff's sleep was poor, her affect was flat, and she had neuropathy. (*Id.*). Dr. Gecosala assessed bronchitis, acute pneumonitis; shoulder pain; back degenerative disc and joint disease; knee osteoarthritis; lateral epicondylitis; and fibromyalgia. (*Id.*). Plaintiff returned several times for follow up with Dr. Gecosala throughout May 2007. (*See* TR. 470-472).

Plaintiff again presented to Dr. Gecosala on June 6, 2007 complaining of shoulder

---

[3]The impingement test showed positive signs on Neer and Hawkins and negative signs on cross body, O'Brien's and Speed's. (TR. 480).

pain in addition to ongoing back pain and joint swelling. (TR. 467).   A musculoskeletal exam showed swelling and crepitance of the joints; limited lumbar ranges of motion and spasms with radicular symptoms; paraspinal tenderness; decreased reflexes (3/5)  in the lower extremities; limited cervical ranges of motion with paraspinal tenderness and spasms. (TR. 468).  Neuropsychiatric examination showed a flat affect and symptom aggravation by stress and poor sleep.  (*Id.*).  Dr. Gecosala's diagnoses were: low back pain; knee pain; rotator cuff syndrome; lateral epicondylitis; and insomnia due to medical conditions.  (TR. 468-469).  He prescribed Oxycodone, Voltaren, and Diazepam. (TR. 469). Plaintiff returned for follow up visits three additional times in June 2007. (TR. 464-466).

On July 13, 2007, Plaintiff returned with complaints of continued back pain, shoulder pain and sensitivity to pressure, and joint swelling.  (TR. 459).  A musculoskeletal exam showed limited lumbar ranges of motion with paraspinal tenderness and spasms with radicular symptoms; reflexes were "3/5 on left and right lower extremities"; limited cervical ranges of motion with mild radicular symptoms and crepitations and spasms with maneuvers; crepiance, restricted range of motion, swelling and tenderness in the right hip joint; medial and lateral meniscus injury in the left knee joint; and swelling and restricted range of motion in the left ankle.   (TR. 460).   Plaintiff also appeared anxious, tense and depressed.  (*Id.*). Dr. Gecosala diagnosed: joint pain in shoulder region; joint pain in multiple sites; rheumatoid arthritis; and moderate depression.  (TR. 461).   He continued Plaintiff on Oxycodone and Voltaren.  (*Id.*).  July 23, 2007 treatment notes indicated multiple joint pain.  (TR. 458).

Dr. Gecosala's notes from August and September 2007 generally indicate Plaintiff's multiple joint pain (TR. 455-457) and that Plaintiff had unspecified limitations for her back, neck, shoulder and/or hip (TR. 451-454, 457).

An October 9, 2007 MRI of Plaintiff's lumbar spine, ordered by Dr. Gecosala, showed severe bilateral facet degeneration at L4-L5 and L5-S1; disc bulge at L4-L5; significant herniated nucleus pulposus; and "rapid ongoing degeneration" on comparison to previous films.  (TR. 433).

On October 25, 2007, Plaintiff presented with complaints of pain in her lower back,

1   knee and shoulder with continued insomnia. (TR. 447).  Examination revealed anxiousness

2   with a flat affect; limited shoulder motion and positive impingement and drop arm tests;

3   limited forward flexion; paraspinal tenderness; sciatica; limited range of motion for the back;

4   and crepitus with pain along the joint line.  (*Id.*).  Plaintiff requested and received a

5   prescription for additional Oxycodone for a planned trip to New York. (*Id.*).  Dr. Gecosala

6   also gave her a home exercise program.  (*Id.*).

7       On November 2, 2007, Plaintiff complained to Dr. Gecosala of right knee pain and

8   foot numbness. (TR. 445).  She was using a cane and was limping.  (*Id.*).  A pinprick test to

9   Plaintiff's numb foot was negative.  (*Id.*).  Examination showed limited lumbar ranges of

10  motion; paraspinal tenderness; sciatica; neuropathy; and a flat affect.  (*Id.*).  He continued

11  Plaintiff on Voltaren for knee pain and Oxycodone and dispensed Phentermine for weight

12  loss.  (*Id.*).  On followup on November 12, 2007, Dr. Gecosala noted that Plaintiff had knee

13  arthritis, shoulder impingement syndrome or rotator cuff syndrome, chronic back pain,

14  rheumatoid arthritis and multiple medical problems. (TR. 444). Examination showed limited

15  range of motion for the back; limited range of motion for the shoulder with limited internal

16  rotation, external rotation and forward flexion; positive drop arm test; positive impingement

17  test; sciatica, spasms; flat affect; and poor sleep and poor concentration.  (*Id.*).  His diagnoses

18  included: shoulder rotator cuff syndrome; lower lumbar degenerative disc and joint disease;

19  rheumatoid arthritis; and osteoarthritis.  (*Id.*).   He prescribed Oxycodone.  (*Id.*).  On

20  November 21, 2007, Dr. Gecosala again prescribed Oxycodone and Voltaren.  (TR. 443).

21      The record contains three undated letters from Dr Gecosala.  (TR. 423-425).  In one

22  such letter, Dr. Gecosala stated that Plaintiff had undergone physical therapy, chiropractic

23  treatment, and exercise programs. (TR. 425).  "She is presently receiving pool therapy along

24  with medication to help control extreme pain.  Kathleen can no longer work, and is staying

25  with a family member, to assist her with her nine year old daughter and ensure safety.

26  Kathleen is also on a weight loss program that is required to perform joint replacement

27  surgery."  (*Id.*).

28      In another undated letter, Dr. Gecosala stated that Plaintiff

has permanent disability at 100% [sic] she can no longer work. Kathleen has DJD along with arthritis. Kathleen's right knee has been braced for over a year, she has recently been fitted for a stronger brace, as well as a cane. This is do [sic] to two fall's [sic] in June 2007 causing her to break open a small areal on her head, she then fell bruising her left leg and buttocks severely. Although she may at some point have replacements of her knee, she has degeneration in the right shoulder as well as right lower back facet degeneration. The arthritis will grow worse as well as the DJD. Kathleen is being treated with meds to slow that process along with pain and anxiety meds. She is attending pool therapy three times a week and is on [sic] weight loss program to hopefully help the stress on her joints and bone. This has been occurring over the past several years, and had been initially found in 2003.

(TR. 423).

In his third undated letter, Dr. Gecosala stated that there is no cure for Plaintiff's degenerative joint disease, which will continue to worsen. (TR. 424). He also noted that Plaintiff's "high degree of pain...causes sleep disorder." (Id.). He advised that Plaintiff must remain in her current living situation so that she can have assistance with her daughter and to ensure her daughter's safety. (Id.).

### b.    Treating Dr. Iannini[4]

In August 2007, Plaintiff saw rheumatologist Mark Iannini, M.D., on referral from Dr. Gecosala for further evaluation of her osteoarthritis pain. (TR. 430-431). Plaintiff told Dr. Iannini that she had previously "seen numerous physicians including Dr. Berghausen who told her that she had osteoarthritis and may need total knee and total hip replacement surgery. He recommended weight loss and also prescribed Voltaren, oxycodone, and Ultram. She states that she is doing reasonably well with this medication. She has also had injections in her back which she states did not help. She has gone to a chiropractor and had myofascial relief as well as acupuncture which she states does help her." (TR. 430). Examination showed osteoarthritic changes with Heberden's and Bouchard's nodes at the DIPs and PIPs; positive right shoulder impingement sign; tenderness of the subacromial bursa and right trapezius muscle with spasm; mild right knee crepitus; full range of motion bilaterally in the hips; and normal gait. (Id.). He diagnosed: generalized osteoarthritis; right subacromial

---

[4]As discussed *infra*, at IV.C.1.d., the ALJ's assessment of Dr. Gecosala's opinion involves consideration of Dr. Iannini's treatment of Plaintiff.

- 13 -

bursitis; myofascial right shoulder pain with secondary muscle spasm; and chronic pain syndrome. (TR. 431). Dr. Iannini offered injection therapy for Plaintiff's right knee and shoulder, but she declined. (*Id.*). He recommended that she continue pain management with Dr. Gecosala. (*Id.*).

Plaintiff next returned to Dr. Iannini on September 5, 2007, with complaints of right elbow pain, "which hurts when she turns lids on jars and doorknobs." (TR. 428). Plaintiff also reported that her right shoulder pain had improved. (*Id.*). Examination of Plaintiff's right elbow showed full range of motion and tenderness over the extensor forearm muscle group. (*Id.*). Examination of Plaintiff's right shoulder revealed a positive impingement sign, tenderness over the subacromial bursa. (*Id.*). Knee exam showed crepitus over the knee joints. (*Id.*). Dr. Iannini diagnosed: osteoarthritis; right subacromial bursitis; right lateral epicondylitis; myofascial pain syndrome; and chronic pain syndrome. (*Id.*). Plaintiff asked many questions about injection therapy, "but was hesitant to proceed" and wanted to discuss the treatment with Dr. Gecosala. (*Id.*). On September 24, 2007, she underwent the recommended trigger point injections in the right upper back and neck.[5]   (TR. 432).

### c.    Examining Dr. Petronella

In March 2008, Richard Petronella, M.D., examined Plaintiff at the request of the State agency.[6] (TR. 493-494). Plaintiff told Dr. Petronella that she injured her right shoulder at work in 2003 and was diagnosed with a right clavicular fracture and a torn rotator cuff.

---

[5]A letter from Dr. Iannini's office to Dr. Gecosala indicating that Plaintiff received the injections bears a typewritten date of August 13, 2007, and "9/24/07" is handwritten on the letter as well. (TR. 432). The typed letter indicates that Plaintiff saw Dr. Iannini "on September 5, 2007 and has decided that she would like to try...[trigger point injections on her right upper back and neck] to see if it helps with her chronic muscle spasm and myofascial pain." (*Id.*). Plaintiff cites to this record when stating that she received trigger point injections on September 24, 2007. (Plaintiff's Brief, p.8). Defendant does not dispute this assertion. Moreover, the fact that the letter refers to Plaintiff's September 5, 2007 appointment establishes that the letter could not have been written earlier in August 2007.

[6]The parties agree that Dr. Petronella is a specialist in physical medicine and rehabilitation. (Plaintiff's Brief, p. 10; Defendant's Brief, p. 3).

(TR. 493).  Soon thereafter, she re-injured her shoulder in a car accident.  (*Id.*).  Plaintiff told Dr. Petronella that she experienced chronic pain to her right shoulder, right elbow, right knee, neck, and low back.  (*Id.*). Plaintiff also told Dr. Petronella "that sometimes standing bothers her right knee and other days not."  (*Id.*).   She reported that she has undergone trigger point injections to the neck and right shoulder without long-term relief and that she currently received acupuncture and manipulation treatment once a week, and attended pool therapy twice a week, which she felt was helpful.  (*Id.*).  She wore a knee brace, used a cane, and took Oxycodone for pain. (*Id.*).  Dr. Petronella noted that Plaintiff weighed 154 pounds and was approximately 4' 10" in height.  (TR. 494).  He observed that she "ambulates with a pronounced right antalgic gait with a straight cane in her left hand." (*Id.*). Dr. Petronella indicated that Plaintiff had pain magnification throughout her physical examination.  (*Id.*). On examination, Dr. Petronella noted moderate tenderness to palpation of cervical paraspinals and upper trapezius bilaterally; full cervical range of motion; diffuse right shoulder tenderness with "guarded" range of motion "greatly restricted in all planes"; full right elbow range of motion with tenderness over the lateral epicondyle and tenderness over the lateral glenohumeral joint; positive patella effusion test of the right knee  and limited range of motion in the knee "due to guarding"; moderate tenderness to  palpation of the lower lumbar paraspinals bilaterally with limited range of motion "due to guarding"; full and painless range of motion in hips; and upper and lower extremity strength testing was 5/5. (*Id.*).  He also noted that Plaintiff "gets on and off the exam table with much pain behavior." (*Id.*).

Dr. Petronella's impression was: chronic pain syndrome with lumbar degenerative joint disease; right chondromalacia patella; right subacromial bursitis; and right lateral epicondylitis.  (*Id.*).  Dr. Petronella completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) wherein he indicated that Plaintiff could: lift and carry 20 pounds frequently and 50 pounds occasionally; sit for 4 hours at a time, for a total of 8 hours, in an 8-hour workday; stand for 2 hours at a time, for a total of 4 hours, in an 8-hour work; walk for 1 hour at a time, for a total of  2 hours, in an 8-hour workday; occasionally

1    reach overhead with the right hand; occasionally climb, balance, stoop, and crouch; never

2    kneel or crawl; and occasionally be exposed to environmental hazards.  (TR. 496-501).  He

3    also indicated that Plaintiff did not require a cane to ambulate and that she could perform

4    activities of daily living like: shopping; traveling without a companion; walking without the

5    use of a wheelchair, walker, 2 canes, or 2 crutches; walking a block at a reasonable pace on

6    rough or uneven surfaces; using public transportation; climbing a few steps at a reasonable

7    pace; preparing a simple meal for herself; caring for her personal hygiene; and sorting,

8    handling and using paper files.  (TR. 497, 501).

9                              d.      The ALJ's reasons for rejecting of Dr. Gecosala's opinion

10            "Because treating physicians are employed to cure and thus have a greater opportunity

11   to know and observe the patient as an individual, their opinions  are given greater weight

12   than the opinions of other [non-treating] physicians."  *Smolen v. Chater,* 80 F.3d 1273, 1285

13   (9th Cir. 1996)(citation omitted); *see also Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007)

14   (citation omitted).  In this case, the ALJ can reject treating Dr. Gecosala's opinion only if he

15   sets forth specific and legitimate reasons for doing so that are based on substantial evidence

16   in the record.  *Orn,* 495 F.3d at 632. (citation omitted); (Plaintiff's Brief, pp. 13-15 (citations

17   omitted)).  "This can be done by setting out a detailed and thorough summary of the facts and

18   conflicting clinical evidence, stating his interpretation thereof, and making findings.  The

19   ALJ must do more than offer his conclusions. He must set forth his own interpretations and

20   explain why they, rather than the doctors' are correct."  *Orn,* 495 F.3d at 632 (citations

21   omitted).

22           The ALJ gave "great weight to the opinion of Dr. Petronella as his opinion is based

23   on a personal examination of claimant, his observations of her condition and claimant's

24   statements as to her activities of daily living."  (TR. 25).  The ALJ also found that Dr.

25   Petronella's opinion was "consistent with the balance of the medical record."  (*Id.*).  The ALJ

26   gave "little weight" to Dr. Gecosala's opinion because: he "treated claimant on a limited

27   basis for several months in 2007"; his "examinations did not thoroughly examine claimant's

28   physical capacity as those conducted by consultative examiners..."; his opinions were

- 16 -

1   inconsistent with plaintiff's activities of daily living and the balance of the medical record;

2   and  his "undated opinion is unclear as to claimant's improvements in treatment as stated by

3   Dr. Iannini, and is over two years old."  (*Id.*).

4          The ALJ's conclusion that Plaintiff's severe impairments included degenerative disc

5   disease of the cervical and lumbar spine, fracture and tendonitis of the right clavicle,

6   degenerative joint disease of the right elbow and right knee, and chronic pain syndrome is

7   consistent with the diagnoses provided by Dr. Gecosala as well as that provided by Dr.

8   Petronella.  The ALJ found fault with Dr. Gecosala's assessments for the reasons that Dr.

9   Gecosala treated Plaintiff "on a limited basis..." and that Dr. Gecosala's "examinations did

10  not thoroughly examine claimant's physical capacity as those conducted by consultative

11  examiners...." (TR. 25).  Factors relevant to evaluation of a treating doctor's opinion include

12  the "[l]ength of the treatment relationship and the frequency of examination" in addition to

13  the "the nature and extent of the treatment relationship."  20 C.F.R. §404.1527(c)(2)(i)-(ii).

14   Generally, the longer a treating doctor has treated a claimant and the more times the claimant

15  has been seen by the treating doctor, more weight will be given to the doctor's opinion.  20

16  C.F.R. §404.1527(c)(2)(i).  The record is clear that from approximately April 5, 2007 through

17  November 21, 2007, Plaintiff saw Dr. Gecosala two or more times a month.  (TR. 443-477).

18  Additionally, during this time, he  referred Plaintiff for assessment and treatment by other

19  doctors as well.  Upon review of Dr. Gecosala's treatment notes, the Court agrees with

20  Plaintiff that "[t]he ALJ's reasoning is curious, in that he would ascribe greater thoroughness

21  to an examination conducted on a single occasion rather than on several occasions over

22  time." (Plaintiff's Brief, p. 15).  Moreover, although Dr. Gecosala's notes reflect that his

23  examinations of Plaintiff primarily focused on her lower back, shoulder and knee pain, the

24  record does not support the conclusion that Dr. Gecosala's examinations were less than

25  thorough or less thorough than Dr. Petronella's one-time examination.  Plaintiff also points

26  out that Dr. Petronella's examination yielded almost identical findings as Dr. Gecosala's with

27  regard to Plaintiff's low back and right shoulder in that Dr. Petronella found moderate

28  paraspinal and upper trapezius muscle tenderness bilaterally; diffuse right shoulder

1    tenderness with guarded and grossly restricted ranges of motion; and moderate paralumbar

2    tenderness with limited ranges of motion.  (*Id.* at pp. 15-16 (*citing* TR. 494)); *see also* 20

3    C.F.R. §404.1527(c)(i)).  Both doctors also found limited range of motion in Plaintiff's knee.

4    (TR.  473 (Dr. Gecosala); TR. 494 (Dr. Petronella found limited range of motion in the knee

5    due to guarding)).[7]

6        Defendant argues that Dr. Petronella's opinion was based on independent clinical

7    findings and, thus, were supported by substantial evidence in the record.  (Defendant's Brief,

8    p. 12).[8]  "Independent clinical findings can be either 1) diagnoses that differ from those

9    offered by another physician and that are supported by substantial evidence..., or 2) findings

10   based on objective medical tests that the treating physician has not [himself or] herself

11   considered[.]"  *Orn,* 495 F.3d at 632 (citation omitted); *see also Tonapetyan v. Halter,* 242

12   F.3d 1144, 1149 (9th Cir. 2001) (consultative examining doctor's opinion on its own

13   constituted substantial evidence because it rested on the doctor's independent examination

14   of the plaintiff).  However, where the diagnoses of the treating doctor and examining doctor

15   are the same but their conclusions about the plaintiff's functional limitations differ, the

16   examining doctor's conclusion based on his examination is not considered to be an

17   "independent finding" and the doctor's "opinion does not alone constitute substantial

18   evidence to support the rejection of...[the plaintiff's] treating physician['s[] opinions." *Orn,*

19   _____

20   [7]Treating Dr. Iannini also saw issues with Plaintiff's right knee and offered her trigger
     point injections for that area.  (TR. 431).  Likewise, Dr. Endean, to whom Dr. Gecosala also
21   referred Plaintiff, diagnosed, in addition to other things, chrondomalcia of both knees and
22   internal derangement of the right knee with a suspected meniscal tear.  (TR. 481).

23   [8]The Court notes that, at the outset of Defendant's argument on this issue, Defendant
     pointed out the ALJ found Plaintiff not fully credible and Defendant asserted that the ALJ's
24   credibility evaluation should be affirmed.  (Defendant's Brief, pp. 9-11).  Plaintiff has not
25   challenged the ALJ's credibility determination.  Because the ALJ did not cite Plaintiff's
     credibility as a reason for rejecting Dr. Gecosala's opinion, the ALJ's credibility finding is
26   not relevant to the arguments raised by Plaintiff on this issue.  *Compare Tommasetti v.*
27   *Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) (upholding ALJ's decision where the ALJ
     rejected the treating doctor's assessment for the specific reason that the opinion merely
28   restated the plaintiff's subjective complaints which the ALJ had found not credible).

495 F.3d at 633 (citation omitted) (because examining doctor's diagnoses were the same as those of the treating physicians', and only his conclusions differed, examining doctor's "conclusion concerning [the plaintiff's] ability to stand or walk based on that examination was not an 'independent finding," and his opinion does not alone constitute substantial evidence to support the rejection of [the plaintiff's] treating physicians' opinions.").

Defendant does not identify the specific independent clinical findings supporting Dr. Petronella's opinion.  Nor has the ALJ cited any appreciable difference between Dr. Petronella's examination and Dr. Gecosala's examinations that would support the conclusion that Dr. Petronella's conclusions based on his examination, alone, can be considered an independent clinical finding which would, in turn, constitute substantial evidence.  Instead, the substantial evidence of record reveals that Dr. Petronella's examination and diagnoses did not substantially differ from Dr. Gecosala's.   The instant case is more akin to *Orn* and, as such, Dr. Petronella's conclusions concerning Plaintiff's residual functional capacity do "not alone constitute substantial evidence to support the rejection of..." Plaintiff's treating doctor's opinion.  *Orn,* 495 F.3d at 633.

The ALJ also stated that Dr. Gecosala's opinion was "inconsistent with claimant's activities of daily living and the balance of the medical record." (TR. 25).  The ALJ does not specify Plaintiff's activities that are at odds with Dr. Gecosala's opinion.  Nor does the ALJ mention those aspects of the record, other than Dr. Petronella's opinion, which purportedly conflict with Dr. Gecosala's opinion.  The ALJ's stated reason does not reach the level of specificity required to reject the opinion of a treating physician.  *See McAllister v. Sullivan,* 888 F.2d 599, 602 (9th Cir. 1989) (rejection of treating physician's opinion on ground that it was contrary to the clinical findings in the record and the claimant's activities and interests did not satisfy ALJ's burden because such reasons were "broad and vague, failing to specify why the ALJ felt the treating physician's opinion was flawed.").[9]

---

[9]Although the ALJ did not identify Plaintiff's activities that he felt contradicted Dr. Gecosala's opinion, the ALJ noted elsewhere in his decision that Plaintiff "can perform

1    The ALJ's final reasons for rejecting Dr. Gecosala's opinion are that Dr. Gecosala's

2    "undated opinion is unclear as to claimant's improvements in treatment as stated by Dr.

3    Iannini and is over two years old." (TR. 25). With regard to Plaintiff's treatment by Dr.

4    Iannini, it is unclear what the ALJ is referring to when he mentions "improvements in

5    treatment as stated by Dr. Iannini...." (*Id.*). The record, as well as the ALJ's opinion, reflect

6    that Plaintiff saw Dr. Iannini in 2007 upon referral from Dr. Gecosala. Although Plaintiff

7    initially refused injection therapy, she later permitted Dr. Iannini to administer trigger point

8    injections in the right upper back and neck in September 2007. (TR. 432). The substantial

9    evidence of record supports the conclusion that whatever improvement Plaintiff may have

10   felt after the injections[10] administered by Dr. Iannini was short-lived in light of Dr.

11   Gecosala's notes that: on October 5, 2007, Plaintiff's chief complaints included back pain

12   (TR. 450); on October 25, 2007 Plaintiff's complaints included shoulder pain and, on

13   examination, Plaintiff had, in addition to other things, limited range of motion for the

14   shoulder, positive impingement, positive drop arm test, limited ranges of motion for internal

15   _____

16   activities like shopping, traveling without a companion, ambulate without use of wheelchair

17   or walker, *two* canes or two crutches, walk a block at a reasonable pace on a rough or uneven

18   surface, use standard public transportation, climb a few steps at a reasonable pace with the

     use of a single hand rail, prepare a simple meal and feed herself, care for personal hygiene,

     sort, handle and use paper files." (TR. 22) (emphasis added). These activities were

19   mentioned in Dr. Petronella's assessment. The parties do not specifically discuss in their

20   briefs the ALJ's list of activities. Granting the ALJ the benefit of the doubt that the above-

     stated activities are those he finds in conflict with Dr. Gecosala's opinion, it is not clear on

21   the instant record how these activities conflict with Dr. Gecosala's findings. *See Orn,* 495

22   F.3d at 632 ("The ALJ must do more than offer his conclusions."). Moreover, the Ninth

     Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily

23   activities such as grocery shopping, driving a car, or limited walking for exercise, does not

24   in any way detract from her credibility as to her overall disability. One does not need to be

     'utterly incapacitated' in order to be disabled." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9[th]

25   Cir. 2001) (*quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989)); *see also Fair,* 885

26   F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more

     grueling environment of the workplace....").

27   [10]The records cited by the parties and the ALJ regarding Dr. Iannini's treatment

28   indicate that he administered injections on one occasion only.

and external rotation, limited forward flexion, limited range of motion for the back, and paraspinal tenderness[11] (TR. 447); and on November 12, 2007, when Plaintiff's complaints included chronic back pain and limited range of motion of the shoulder, Dr. Gecosala found Plaintiff had limited range of motion of the back, limited range of motion for the shoulder with limited internal and external rotation and forward flexion, positive drop arm test,  and positive impingement test. (TR. 444).  Moreover, consistent with Dr. Gecosala's findings, Plaintiff told Dr. Petronella in March 2008 that trigger point injections to her neck and right shoulder did not give her long term relief.  (TR. 493).  On the instant record, there is no reasonable basis to believe that Dr. Gecosala's opinion is unreliable because it may not have accounted for any claimed improvement after Plaintiff received trigger point injections from Dr. Iannini in 2007.

Finally, the ALJ rejected Dr. Gecosala's undated opinion because it "is over two years old."  (TR. 25).  Because Dr. Gecosala's statements that Plaintiff is disabled are undated, there is no way to pinpoint, on the instant record, whether Dr. Gecosala made these statements during 2007 when he treated Plaintiff or at some later time. Given that Dr. Gecosala's letters had to have been written some time after March 2007, and given that the ALJ adopted the opinion of an examining doctor dated March 12, 2008, which was itself almost two years old when the ALJ issued his January 26, 2010 decision, the instant record does not support rejecting Dr. Gecosala's opinion solely because it was undated and could have been more than two years old at the time the ALJ rendered his decision.

For the foregoing reasons, the ALJ has failed to set forth specific and legitimate reasons supported by substantial evidence to reject Dr. Gecosala's opinion.

> 2.     Whether the ALJ improperly rejected the opinion of treating Dr.
> Skinner

In December 2007, Plaintiff began treatment at Healthcare Southwest with Dr.

---

[11]Dr. Gecosala's notes do not indicate the precise location on Plaintiff's back where she experienced paraspinal tenderness and limitation in range of motion.

1    Yvonne Skinner, whom both parties agree is a specialist in pain management. (TR. 515, 548-

2    549; Plaintiff's Brief, p. 9; Defendant's Brief, p. 5).  When Plaintiff presented at Healthcare

3    Southwest in 2007, she reported a history of osteoarthritis of the right knee, a fractured

4    clavicle in 2003, right elbow swelling, herniated lumbar disks, and that she was sleeping no

5    more than a couple of hours a night.  (TR. 548-549).  The diagnoses were: anxiety with

6    panic; and a history of a right clavicle fracture, torn rotator cuff, osteoarthritis, degenerative

7    joint disease of the lumbar spine, and right elbow epicondylitis.  (TR. 549).

8         On monthly visits to Healthcare Southwest between April and June of 2008, Plaintiff's

9    pain medications were refilled.  (TR. 546 (also, in May and June 2008, Plaintiff continued

10   to complain of sleep problems)).  In August 2008, Plaintiff reported that her sleep and

11   appetite were not good, and the treatment note reflected: panic attacks. (TR. 545).  Over

12   monthly visits throughout the rest of 2008, Plaintiff complained of pain in her neck, shoulder,

13   elbow, knee and/or left hip (TR. 528, 532, 536, 537, 539, 540, 544; *see also* 531 (mentioning

14   pain)), fatigue  (TR. 529, 533, 536, 544), poor appetite (TR. 543), impaired sleep (TR. 533,

15   537, 539, 544), and feeling "stressed", anxiety and/or depressed. (TR. 528, 536, 537,541, 540

16   543, 544).  Treatment notes reflected that Plaintiff exhibited an unstable or stiff gait (TR.

17   537, 540 (January and March 2009)), tearfulness, depression, and anxiety (TR. 529

18   (November 2009)),  and on exam she had left hip pain and tenderness (TR. 537, 538, 539

19   (February and March 2009)).

20        In June 2009, Plaintiff reported that the consultative examination she had undergone

21   was "very painful." (TR. 535).  A September 22, 2009, treatment note reflects that her

22   appetite and sleep were "good" and that she planned to undergo surgery in the next two

23   months.  (TR. 531).  An October 20, 2009 treatment note reflects that Plaintiff's pain level

24   was at 4-5 on medication, her appetite was good and her mood was anxious.  (TR. 589).

25        On May 26, 2009, Dr. Skinner completed a Multiple Impairment Questionnaire

26   wherein she indicated the following diagnoses: osteoarthritis; degenerative joint disease; disc

27   bulge; chronic severe pain; diabetes; sleep disorder; depression; anxiety; and memory

28

problems. (TR. 515). Dr. Skinner based her diagnosis on: MRIs from 2003, 2004, 2007, laboratory results, and "continuously seeing [Plaintiff] on monthly basis..." once or twice a month. (TR. 516). Dr. Skinner further stated that in an 8-hour day, Plaintiff: could sit, stand and walk for 0 hours; could not lift and carry anything heavier than five pounds on an occasional basis; was precluded from grasping, turning, and twisting objects; was precluded from using her fingers and hands for fine manipulations on the right and was moderately limited in doing so on the left; was precluded from using her arms for reaching, including overhead. (TR. 517-519). Additionally, Plaintiff could not sit continuously or stand continuously in a work setting and must be able to get up and move around every 5 to 10 minutes. (TR. 517). Dr. Skinner also opined that Plaintiff's symptoms would "constantly" interfere with her ability to maintain attention and concentration; that she would be incapable of tolerating "even [a] low stress" work environment; and that emotional factors, such as anxiety, panic, depression and impaired memory and sleep, contribute to Plaintiff's functional limitations. (TR. 520). According to Dr. Skinner, Plaintiff "cannot work[,] stress brings on panic causing more pain. [Plaintiff] is unable to stay on task and must rest[,] medication causes drowsiness[,] movement is very limited." (TR, 521).

On December 11, 2009, Dr. Skinner completed an Arthritis Impairment Questionnaire wherein she indicated the following diagnosis: osteoarthritis; degenerative disc disorder; sleep disorder; depression; diabetes; neuropathy; panic disorder; spine degeneration; and fibromyalgia. (TR. 612). Dr. Skinner's assessment was generally similar to her May 26, 2009 assessment except that she indicated Plaintiff: could sit for 0-30 minutes in an 8-hour day; stand/walk for 0-5 minutes in an 8-hour day; and lift and carry up to 2 pounds occasionally. (TR. 615-616). Dr. Skinner stated that Plaintiff's "problems have no cure, she panics upon not being able to do things she used to do, stress causes more pain as well as fibromyalgia." (TR. 617). In Dr. Skinner's opinion, Plaintiff is "100% disabled" and "can no longer work." (TR. 618).

a.     The ALJ's rejection of Dr. Skinner's opinion

The ALJ found that Dr. Skinner's opinion with regard to Plaintiff's limitations were not supported by objectively medically acceptable clinical or laboratory diagnostic examinations and is "generally inconsistent with the balance of the medical record." (TR. 25). The ALJ further stated that he

> reviewed and examined the records of treatment provided by Healthcare Southwest, but these records are limited in the examination of claimant, do not provide a description of the tests conducted and are unclear as to the medical provider and appear as through [sic] they were filled out by multiple writers which do not indicate their origin or degree of medical professionalism.

(*Id.*).

Plaintiff concedes that the notes from Healthcare Southwest "are handwritten, barely legible, and do not contain a clear signature or other reference to the provider who authored them. (T[R]. 588-610)." (Plaintiff's brief, p. 18). Plaintiff argues that it was incumbent on the ALJ to obtain further information from Dr. Skinner regarding the basis for her assessment, including clarification of the treatment notes. (*Id.*). Even if the treatment notes are attributed to Dr. Skinner, nothing in those notes would support Dr. Skinner's ultimate opinion regarding Plaintiff's functional limitations. *See Matney,* 981 F.2d at 1019 ("The ALJ need not accept an opinion of a physician-even a treating physician-if it is conclusory and brief and is unsupported by clinical findings."). The notes reflect Plaintiff's complaints of pain but do not indicate that any sort of physical examination, other than hip palpation, was performed. Even granting Plaintiff the benefit of the doubt that a physical examination had been performed, the treatment notes are devoid of any clinical findings that would support Dr. Skinner's restrictions. Likewise, although the notes reflect Plaintiff's reports of stress, anxiety, and the like, they contain little, if any, of the note taker's findings concerning the alleged conditions and/or the severity thereof. On the instant record, the ALJ gave sufficient reasons to reject Dr. Skinner's opinion. *See id.; Johnson v. Shalala,* 60 F.3d 1428 (9th Cir. 1995) (affirming ALJ's rejection of treating doctor's opinion where the medical reports "make only limited references to medically observed limitations on functional capacity....").

1

### 3. Remand

2    Plaintiff requests that the Court either reverse the Commissioner's decision and grant

3 benefits or, alternatively, remand for further proceedings.  (Plaintiff's Brief, p.1).

4    "'[T]he decision whether to remand the case for additional evidence or simply to

5 award benefits is within the discretion of the court.'"  *Rodriguez v. Bowen,* 876 F.2d 759, 763

6 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for

7 further administrative proceedings is appropriate if enhancement of the record would be

8 useful."  *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (*citing Harman v. Apfel,*

9 211 F.3d 1172, 1178 (9th Cir. 2000)).   Conversely, remand for an award of benefits is

10 appropriate where:

11
> (1) the ALJ failed to provide legally sufficient reasons for rejecting the
> evidence; (2) there are no outstanding issues that must be resolved before a

12
> determination of disability can be made; and (3) it is clear from the record that
> the ALJ would be required to find the claimant disabled were such evidence

13
> credited.

14 *Benecke,* 379 F.3d at 593(citations omitted).   Where the test is met, "we will not remand

15 solely to allow the ALJ to make specific findings....Rather, we take the relevant testimony

16 to be established as true and remand for an award of benefits."  *Id.* (citations omitted).

17    The finding of "disabled" under the Social Security Act involves both a medical and

18 a vocational component. *See Frost v. Barnhart,* 314 F.3d 359, 365  (9th Cir. 2002); *Harman,*

19 211 F.3d at 1180.  Although Dr. Gecosala stated that Plaintiff was "100% disabled..." and

20 "can no longer work", Dr. Gecosala's conclusion "is a medical rather than a legal

21 conclusion" and, thus, does not necessarily address the vocational component of the

22 disability issue. *See Harman,* 211 F.3d at 1180.  The record is devoid of a residual functional

23 capacity assessment by Dr. Gecosala.  It may well be that Dr. Gecosala's opinion as to

24 Plaintiff's total disability means that Plaintiff is unable to perform past work but may be able

25 to perform some other kind of work.  The Ninth Circuit has recognized that, in social security

26 cases, the ALJ has a duty to develop the record fully and fairly, even when the claimant is

27

28

1    represented by counsel.[12] *Tonapetyan,* 242 F.3d at 1150.  The Commissioner is also entitled

2    to explore with a vocational expert Plaintiff's ability to work in light of Dr. Gecosala's

3    restrictions, once they have been determined. It may well be that, although Dr. Gecosala is

4    of the opinion that Plaintiff is totally disabled, work nonetheless exists that Plaintiff can

5    perform in light of his specified restrictions.  "In cases where the testimony of the vocational

6    expert has failed to address a claimant's limitations as established by improperly discredited

7    evidence, [the Ninth Circuit has] consistently...remanded for further proceedings rather than

8    payment of benefits."  *Harmon,* 211 F.3d at 1180 (citation omitted).  "The appropriate

9    remedy in this situation is to remand the case to the ALJ..." for further proceedings consistent

10   with this Order.  *Id.*  "Alternatively, the...[Commissioner] may decide to award benefits."

11   *See McAllister,* 888 F.2d at 604.

12   **V.    CONCLUSION**

13        For the foregoing reasons, remand for further proceedings is necessary to consider

14   whether Plaintiff is disabled in light of the fact that Dr. Gecosala's opinion was improperly

15   rejected.  Accordingly,

16        IT IS ORDERED that the Commissioner's final decision in this matter is

17   REMANDED for further proceedings consistent with this Order. The Clerk of Court is

18   instructed to enter judgment accordingly and close this case.

19        DATED this 11th day of September, 2012.

20

21   _____

22        Héctor C. Estrada
     United States Magistrate Judge

23

24

25   _____

26        [12]No attempt was made to clarify precisely what Dr. Gecosala meant, when he opined
     that Plaintiff was 100% disabled, in terms of his opinion of Plaintiff's actual residual

27   functional capacity concerning areas including Plaintiff's ability to lift, walk, stand, carry,
     sit and the like.

28